# TAB B

Dockets.Justia.com

LEXSEE 1995 U.S. DIST. LEXIS 19805

DAVID G. FINCH, Plaintiff, v. HERCULES INCORPORATED, Defendant.

Civil Action No. 92-251 MMS

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

1995 U.S. Dist. LEXIS 19805

December 22, 1995, Dated

**NOTICE:** [*1] NOT FOR PUBLICATION

**COUNSEL:** For plaintiff: Richard G. Elliott, Jr., Esq., and Helen M. Richards, Esq., of Richards, Layton & Finger, Wilmington, Delaware.

For defendant: Sheldon N. Sandler, Esq., and Bhavana Boggs, Esq., of Young, Conaway, Stargatt & Taylor, Wilmington, Delaware.

**JUDGES:** Murray M. Schwartz, Senior District Judge

**OPINION BY:** Murray M. Schwartz

**OPINION**

*MEMORANDUM OPINION*

Dated: December 22, 1995

Wilmington, Delaware

Schwartz, Senior District Judge

**I. INTRODUCTION**

Plaintiff David G. Finch ("Finch") has filed suit against his former employer, defendant Hercules, Incorporated ("Hercules" or "corporation"), alleging he was discriminated against based on his age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621-34. After over three years of adamantine posturing by both parties, the case is finally poised for trial. Before the Court are plaintiff's and defendant's cross-motions in limine seeking the exclusion of various evidence and witnesses in the upcoming trial.

For the reasons set forth below, the Court will grant in part and deny in part both motions in limine.

**II. FACTUAL BACKGROUND**

For its fifth recitation [*2] of this saga, the Court gleans the following facts, for the most part, from the parties' joint Pretrial Stipulation, Docket Item ("D.I.") 204. Finch is presently age 63 and was born on July 22, 1932. He started his tenure at Hercules in 1962 as a Systems Analyst, progressing up the company hierarchy to the helm of the Audit Department, a position he held for eleven years until Hercules terminated him in February 1991. At that time, Finch was titled as General Auditor and reported to the corporation's Chief Financial Officer, Arden B. Engebretsen ("Engebretsen"). When terminated, Finch was 58 years old and earning an annual salary of $102,608.

Finch's termination in 1991 is characterized by Hercules as part of a reduction-in-force ("RIF"), which had its genesis in late 1990. The 1991 RIF, which eliminated 402 employees, was merely one in a series of staff reductions in an overall program of restructuring that Hercules had commenced in the mid-1980s. To assist with the RIF process, Hercules hired Thomas S. Litras Consultants ("Litras"), which recommended a forced ranking/paired comparison process to select the individuals to be terminated.[1] In its proposal for ranking employees, [*3] Litras recommended that the corporation consider "performance, education, versatility, flexibility, and continuous service. Age [was] to be the last factor considered, and then *only if a 'tie-breaker' was required.* If there was a tie, Hercules was to retain the older employee." *Finch v. Hercules, Inc.*, 865 F. Supp. 1104, 1112-13 (D. Del. 1994) (emphasis in original; internal citations omitted). It was agreed that Hercules' pre-existing performance appraisal system was inadequate to support the required decisionmaking.

1  When force-ranking employees, "evaluators are instructed to identify the 'best employee' and the 'worst' employee with regard to a particular factor, and then the second best and the second worst, and so on down the line." *Finch v. Hercu-*

Case 5:07-mc-00515-FB-PMA   Document 3-3   Filed 06/25/2007   Page 3 of 14

Page 2
1995 U.S. Dist. LEXIS 19805, *

les, Inc., 865 F. Supp. 1104, 1111 n.4 (D. Del. 1994) (quoting N. Thompson Powers, *Reductions in Force Under the Age Discrimination in Employment Act*, 2 Lab. Law. 197, 216-217 (1986)). *See generally* this Court's previous opinion, *supra*, for a more extensive treatment of the factual details in this action.

[*4] In December, 1990, before any employee had been selected for termination, the Hercules Board of Directors appointed Thomas L. Gossage ("Gossage") as the corporation's new Chief Executive Officer ("CEO"). Coincident with these events, Hercules' Chief Financial Officer ("CFO") Engebretsen also retired, positioning Finch, at least on paper, as directly reporting to the neophyte CEO Gossage. Gossage subsequently gave George MacKenzie ("MacKenzie"), the corporation's Controller, responsibility for Finch's Audit Department.

MacKenzie undertook the forced-ranking of seven managers from the Audit and Controller's Departments. He ranked Finch near the bottom of the list at sixth place. On January 26, 1991, MacKenzie obtained approval for the elimination of the position of General Auditor and, therefore, Finch (as well as the employee who was listed in last place). MacKenzie broke the news to Finch on February 4, 1991; Finch was terminated effective February 28, 1991.

Later in 1991, the successor Chief Financial Officer reinstated the position of General Auditor, but did not interview Finch in the process. Instead, Hercules hired Curtis Tomlin, age 38, for Finch's former position. In response [*5] to this entire series of events, armed with his Equal Employment Opportunity Commission right-to-sue letter, Finch brought this action on May 5, 1992. At this point, it is uncertain whether this case will be treated under a "mixed motive" analysis, *see Price Waterhouse v. Hopkins*, 490 U.S. 228, 104 L. Ed. 2d 268, 109 S. Ct. 1775 (1989); *Griffiths v. CIGNA*, 988 F.2d 457 (3d Cir.), *cert. denied*, 510 U.S. 865, 126 L. Ed. 2d 145, 114 S. Ct. 186 (1993), or a "pretext" mode of analysis, *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973); *Miller v. CIGNA*, 47 F.3d 586 (3d Cir. 1995). [2]

2   For a complete summary of how these analyses differ, *see generally, Finch v. Hercules*, 865 F. Supp. at 1118-1119; *Mardell v. Harleysville Life Ins. Co.*, 31 F.3d 1221 at 1225 n.6 (3d Cir. 1994), *opinion vacated on other grounds*, 115 S. Ct. 1397 (1995).

### III. CROSS-MOTIONS IN LIMINE

Finch has moved in limine for a ruling on the admissibility of various evidence and testimony [*6] that Hercules proposes to put forth at trial. Hercules has likewise cross-moved in limine.

### A. Plaintiff's Motion in Limine

#### 1. Evidence Not Considered by MacKenzie When Force-Ranning Finch

As part of its defense to plaintiff's allegations of age discrimination, Hercules seeks to introduce at trial three types of documentary evidence. First, defendant offers an Indirect Productivity Improvement ("IPI") study performed by outside consultants in 1989 as evidence that Hercules needed a more proactive, involved audit department. *See* D.I. 119 at 486. This IPI study was not factored into any of the adverse employment decisions affecting plaintiff. Second, Hercules seeks to introduce evidence generated contemporaneously with the RIF process. During the latter part of January, 1991, Hercules reviewed the performance of all corporate staff groups for purposes of determining the amount of incentive bonuses ("Management Incentive Compensation Plan" or "MICP") for senior staff employees. Plaintiff asserts, and defendant does not contest, that the results of this MICP evaluation were not known until *after* Hercules decided to terminate Finch. Finally, Hercules seeks to admit [*7] Performance Appraisal Reports prepared by Finch for two of his employees.

Plaintiff argues that none of this evidence surfaced until the discovery phase of this litigation; MacKenzie did not consider any of it in his decision to terminate Finch. As such, plaintiff argues, the above documents should be inadmissible as "after-acquired" evidence under *McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352, 130 L. Ed. 2d 852, 115 S. Ct. 879 (1995), and its progeny. The Third Circuit Court of Appeals has characterized after-acquired evidence as "evidence of the employee's . . . misconduct or dishonesty which the employer did not know about at the time it acted adversely to the employee . . ., but which it discovered at some point prior to, or more typically, during subsequent legal proceedings; the employer then tries to capitalize on the evidence to diminish or preclude entirely its liability for otherwise unlawful employment discrimination." *Mardell v. Harleysville Life Ins. Co.*, 31 F.3d at 1222. The evidence of which plaintiff complains does not involve any misconduct or dishonesty by Finch that would serve as a *post hoc* justification for Hercules terminating him; it therefore does [*8] not quite fit the Third Circuit's paradigm as being after-acquired. Nevertheless, "to be admissible in either a mixed motives or pretext case, evidence must be relevant to the proofs or rebuttals of defendant's discriminatory motivation." *Finch v. Hercules, Inc.*, 865 F. Supp. at 1110 n.3 (D. Del. 1994) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 125 L. Ed.

Case 5:07-mc-00515-FB-PMA    Document 3-3    Filed 06/25/2007    Page 4 of 14

Page 3
1995 U.S. Dist. LEXIS 19805, *

2d 407, 113 S. Ct. 2742 (1993)). *See also Mardell*, 31 F.3d at 1229 (employee must show that age was a substantial factor motivating the adverse employment decision at the time it was made). The person involved in the forced-ranking of plaintiff, MacKenzie, was not aware of either the IPI study or the MICP evaluation until after the decision to terminate Finch had been made. Consequently, this evidence could not have affected Hercules' motivation in either the forced-ranking process or the ultimate decision to terminate Finch.

Hercules counters that the above evidence is not after-acquired evidence, and that the results of the IPI study and the MICP reports are not being introduced as a basis for MacKenzie's termination decision. Rather, defendant seeks to rebut Finch's assertion that his performance as auditor was "consistently [*9] excellent." *See* Complaint, D.I. 1 at P 8. Hercules would introduce the evidence to show MacKenzie's decision was not "mistaken and unreasonable," but rather was consistent with the vast majority of other high ranking officials' opinions at Hercules. Answer Brief, D.I. 226 at 3. Plaintiff rejoins by citing Fed. R. Evid. 403 and arguing that the dangers of confusing and misleading the jury and the resultant prejudice substantially outweigh any probative value of this evidence.

The Court agrees that any limited probative utility of the IPI and MICP evidence would be substantially outweighed by the undue prejudice to plaintiff. Because MacKenzie did not consider and did not know of unflattering statistics, they are not probative of his decision-making process. Hercules should not be allowed to present, after the fact, further justification for its actions if that justification was completely uncontemplated at the relevant time. At issue is whether a discriminatory animus motivated Hercules in the employment decisions it made adverse to plaintiff at the time those decisions were made. *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994); *Mardell*, 31 F.3d at 1229. Accordingly, [*10] for purposes of liability, a jury will deliberate as to whether Hercules was so motivated on the information it availed itself of at the time.[3] Admission of the MICP or IPI evidence would serve only to feed the jury facts that are extraneous to its task, yet once presented, would be difficult to "unlearn." Consequently, the Court finds any marginal relevance this evidence may have is substantially outweighed by the dangers of confusion and prejudice.

> 3    When this issue first surfaced, the court suggested bifurcation of the liability and damages phases of the trial. At that time, Hercules declined the offer. If Hercules wishes bifurcation it should promptly file a motion requesting the same. Under *MMardell*, after-acquired evidence is not admissible in the liability stage of a cause of action brought under the ADEA. *Mardell*, 31 F.3d at 1239; *see also Mardell v. Harleysville Life Ins. Co.*, 65 F.3d 1072, 1073 n.1 (3d Cir. 1995). The evidence the Court holds inadmissible here, *i.e.*, the MICP and IPI evidence, would be admissible in a damages phase of trial were the issue of damages bifurcated from the liability phase of trial.

[*11] The Courts views differently, however, the third type of evidence Hercules proffers, *i.e.*, Performance Appraisal Reports authored by Finch as products of his evaluating two subordinate employees. Hercules argues that Finch has:

> expressed disbelief in his low ranking by MacKenzie and has claimed that it could only be due to a discriminatory motive, because his supervisor gave him good evaluations. Ironically, Finch himself ranked two of his employees, Droney and Mekinc, at the bottom of the forced rankings after having given them good evaluations

Defendant's Answer Brief, D.I. 226 at 4. Although Finch contends that "Finch's ranking was not based on performance," D.I. 231 at 2, MacKenzie has testified at deposition that his forced ranking of Finch *was* based on performance. D.I. 121 at B-106. The evidence in question is directly relevant to the fact-finder's consideration of whether Hercules employee evaluations necessarily correlate to forced-ranking decisions or an employee's prior performance. Therefore, the Court will allow this evidence to be admitted at trial.

## 2. Evidence of Finch's Reputation

Plaintiff next argues that Hercules will try to introduce [*12] at trial evidence of Finch's general reputation at Hercules. During discovery, one Hercules employee testified that "[Finch] was not well regarded in Hercules other than by his prior boss." D.I. 119 at A374. Another employee provided a sworn statement that "The general perception within Hercules was that Mr. Finch was a lackluster performer . . . ." D.I. 212 at 11, citing D.I. 135 at 8.[4] Finch argues that such testimony concerning the general view of unidentified persons in Hercules management should be excluded as hearsay as it is inherently unreliable, prejudicial, and not susceptible to cross-examination. Finch concedes, however, that a witness's testimony as to his or her own personally-held beliefs is susceptible to cross-examination. D.I. 231 at 8. Finally, Finch contends that such testimony is also barred under

Fed. R. Evid. 701. Hercules counters by arguing that Finch misunderstands both the type of testimony it seeks to offer as well as the applicable law; it argues that this evidence is "exactly the type of testimony permissible under Rule 701." D.I. 226 at 6.

> 4 The above cited affidavit has been ordered stricken. However, Finch referenced it in his brief as a harbinger of possible prejudicial testimony.

[*13] Fed. R. Evid. 701 allows the introduction of lay opinion testimony if the witness' testimony is "limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Hercules maintains that both of the rule's requirements are easily met. First, as fulfillment of part (a), it argues that its witnesses are Hercules managers who have had the opportunity to interact with Finch and observe his performance; thus, they have first-hand knowledge about management's perceptions regarding Finch's performance. For part (b), Hercules contends that the managers' testimony will assist the jury to understand Finch's low rank resulting from the RIF process. It also argues that this testimony is crucial for an understanding of whether it was unreasonable for MacKenzie to conclude that Finch was an unsatisfactory performer and therefore terminate him.

If, as Hercules represents, its witnesses' testimony will be based on each witness's own perception of Finch, the testimony is not hearsay and is admissible. Plaintiff will be able to cross-examine these witnesses [*14] as to the reasons why they formulated their opinions and whether their opinions are rationally based. Although MacKenzie was the actual manager who decided plaintiff's fate, other managers were privy to the same or similar information possessed by MacKenzie regarding plaintiff's performance, assuming Hercules lays the proper foundation under Rule 701(a). Their testimony may corroborate or undermine MacKenzie's decision; either way, this type of testimony is crucial to the fact-finder's consideration of whether Hercules' proffered explanation of its decision to terminate Finch is worthy of credence.

However, because the testimony of the individual managers will be admissible, Hercules will not be allowed to elicit testimony of Finch's general reputation among the Hercules management. The Court agrees with plaintiff that under these circumstances, the probative value of general reputation testimony will be substantially outweighed by the resultant prejudice to plaintiff. It will be unnecessary to ask each manager about how management in general regarded Finch because each manager will have the opportunity to testify about his or her personal and fact-based opinion of plaintiff. The [*15] jury will thus be able to draw its own conclusion as to Finch's reputation by weighing each manager's testimony. Based on this evidence, plus evidence presented by MacKenzie, the jury may or may not infer that it would be reasonable that MacKenzie held these same beliefs.

### 3. Finch's Membership and Participation in the Mormon Church

Plaintiff plans to call at trial Arden Engebretsen, Hercules' former Chief Financial Officer and the administrator to whom plaintiff directly reported. Engebretsen and Finch were members of the same church, the Church of Jesus Christ of Latter-Day Saints, also known as the Mormon Church. During 1977-1980, Finch was a bishop of his and Engebretsen's Mormon congregation; Finch's duties as bishop included counseling members of the congregation, including young adults and teens. In his role as lay bishop, Finch counseled one or more of Engebretsen's children. Hercules argues that evidence of Finch's church-based relationship with Engebretsen is relevant to show that Engebretsen, who was responsible for evaluating Finch's performance, may have been and may still be biased in favor of Finch. Finch agrees that the following evidence is admissible: "that [*16] Engebretsen and Finch attend the same church and that, in connection with Finch's church activities, he counseled Engebretsen's children some fifteen years ago." [5] D.I. 231 at 12. Finch, however, objects to Hercules placing before the jury any specific reference to Finch's denomination, as it is his understanding that the Mormon sect is generally unpopular and not well understood in the eastern United States. As such, Finch argues, all reference to the Mormon Church should be excluded as unduly prejudicial under Rule 403.

> 5 In plaintiff's opening brief, he argued that evidence pertaining to Finch's counseling of Engebretsen's children should be excluded for several reasons. First, he contended that the evidence is both irrelevant and too remote in time to be admissible in the upcoming trial. Second, he declared that this evidence should be excluded based on the clergy-communicant privilege. D.I. 212 at 25-26. However, the defendant argued in its answering brief that this evidence is relevant to show that bias on the part of Engebretsen. Hercules also argued that the clergy-communicant privilege does not shield the identity of the communicants or the fact that the communication took place. D.I. 226 at 15-16. Because plaintiff has since conceded that evidence of plaintiff's counseling the Engebretsen children *is* admissible, the Court will not address this issue.

[*17] Fed. R. Evid. 610 states that "evidence of the beliefs or opinions of a witness on matters of religion is not admissible for the purpose of showing that by reason of their nature the witness' credibility is impaired or enhanced." The rule's advisory committee notes add that while the rule forecloses inquiry into the religious beliefs or opinions of a witness for purposes of showing the witness's character for truthfulness, "an inquiry for the purpose of showing interest or bias because of them is not within the prohibition." The Court agrees that evidence of Finch attending the same church as his supervisor and counseling his supervisor's children is relevant and admissible to show possible bias on the part of Engebretsen. However, Engebretsen's bias, if there is bias, would flow from the nature of the relationship between these two men as members of the same religious community, independent of the specific denomination that community happens to be. Evidence of Finch's and Engebretsen's specific denomination is irrelevant to the substantive issues in this case; even if it were relevant, its probative value is substantially outweighed by the danger of undue prejudice to the plaintiff. [*18] While the Court does not necessarily find that the Mormon religion is unpopular in the District of Delaware, the Court does acknowledge the possibility that this evidence will only serve to distract the jury or take on an inflated and unwarranted significance. The Court therefore holds that evidence of Finch's and Engebretsen's membership in the Mormon church is inadmissible.

### 4. Exclusion of Hercules Witnesses

Plaintiff also moves to exclude or at least limit the testimony of certain Hercules' witnesses as listed in the Pretrial Stipulation. The grounds for exclusion are several.

#### a. Curtis "C.T." Tomlin

Hercules proposes to call Curtis Tomlin, a Harvard-educated, African-American, Certified Public Accountant who, at age 38, was hired in December 1991 as the corporation's new General Auditor. According to defendant, Tomlin was hired when R. Keith Elliott, Hercules' newly appointed Chief Financial Officer, decided to reinstate the General Auditor position. D.I. 226 at 34. Hercules seeks to introduce evidence of Tomlin's credentials and qualifications as probative of Hercules' non-discriminatory motive in re-filling Finch's former position; Finch was not interviewed or [*19] considered for rehire. Hercules also would have Tomlin testify regarding the environment in the Audit Department following Finch's eleven years at the department's helm. Tomlin would paint an unflattering portrait of Finch's legacy by charactering the Audit Department as "dispirited and reactive," one which Tomlin "needed to take considerable steps to improve." D.I. 241 at 30.

Finch argues that he is not alleging that Hercules discriminated against him based on his age when it refused to interview or rehire him in December 1991. Plaintiff argues that the only relevant evidence are Tomlin's hire date, his age, and the position for which he was hired. In his Complaint, Finch chose to allege these very facts as bearing on his age discrimination claim.

The Court agrees that Tomlin's age, date of hire, and position are germane to this action. Plaintiff has argued that the replacement of the 58-year-old Finch by this younger individual is probative of Hercules' discriminatory animus. But, if Finch wishes to offer these facts, Hercules will be allowed to offer proof of Tomlin's credentials as evidence of a legitimate motive underlying its actions. The Court is troubled by Hercules' assumption [*20] that the condition in which Tomlin found the Audit Department, eleven months after Finch was terminated, is directly attributable to Finch. During this interim period, the Audit Department was headed by one or more temporary managers who may or may not have contributed to the departmental environment into which Tomlin was thrust. However, it is simply impossible to determine in advance of trial whether this testimony would be substantially more prejudicial than probative. Accordingly, any ruling on this issue prior to trial would be premature. The Court will entertain argument on this issue during trial, out of the hearing of the jury, just prior to or at the time Tomlin takes the witness stand.

#### b. Witnesses Identified By Hercules in the Pretrial Stipulation

In the Pretrial Stipulation, Hercules identified for the first time as trial witnesses several of its present and former employees: David S. Hollingsworth, predecessor CEO to Gossage; Fred L. Buckner, former President; James J. Anthony, Manager of Administration in the Audit Department; William Godfrey, Manager of Computer Audits from 1980 to 1987, Sue A. Murray, who ran the Audit Department on an interim basis after Finch [*21] was terminated; and Harry Gordon, who was the Director of Executive Resources in Hercules' Human Resources Department.[6]

> 6   In his Opening Brief, plaintiff also initially objected to a witness named Patrick Donohue. However, based on Hercules' description of Donohue's proposed testimony, plaintiff subsequently withdrew his objection. D.I. 231 at 16.

Plaintiff protests that these witnesses should have been disclosed as responsive to the following series of interrogatories:

Case 5:07-mc-00515-FB-PMA   Document 3-3   Filed 06/25/2007   Page 7 of 14

Page 6
1995 U.S. Dist. LEXIS 19805, *

4. Was elimination of the position of General Auditor the sole reason for terminating Mr. Finch? [Hercules' Answer: No]

5. if the answer to Interrogatory 5 was no, please state in detail:

a. each additional reason for terminating Mr. Finch; [Hercules' Answer: In connection with the downsizing, and in compliance with the mandates of Hercules' Policy Compliance Committee's requirements, the Financial Managers falling under the supervision of the Controller's Department were ranked. Mr. Finch's performance caused him to [*22] be ranked among the two lowest ranked financial managers in a group of seven, and these two employees were terminated.]

b. description of each document which refers to the additional reason

c. *the name of each person who has knowledge of the additional reasons*;

d. whether any of the additional reasons were communicated to Mr. Finch, and if so, by whom."

D.I. 227, Exh. C (emphasis added). Plaintiff contends that Hercules was noncompliant with its answers to his discovery requests, specifically question 5c, and that consequently, he never had an opportunity to depose the above witnesses. Fed. R. Civ. P. 26(a)(5) allows parties to propound written interrogatories as a part of the discovery process; the rules also provide a harsh penalty for noncompliance with this discovery mechanism. "A party that without substantial justification fails to disclose information required by Rule 26(a) . . . shall not, unless such failure is harmless, be permitted to use as evidence at a trial . . . any witness not so disclosed." Fed. R. Civ. P. 37(c)(1). Finch requests these witnesses to be excluded from trial. Plaintiff's Opening Brief, D.I. 212 at 31.

Hercules counters that plaintiff's [*23] interrogatories were narrowly focused and, specifically, number 5c was merely "asking for the names of persons who had knowledge of any additional reasons, aside from the position elimination, why Finch was one of those chosen to be RIFed, i.e., knowledge of what those additional reasons were." D.I. 226 at 20. In response to this interrogatory, Hercules identified individuals whom it contends knew *why* Finch was terminated, i.e., that Finch's performance was considered as a factor. The Court agrees that this was a reasonable interpretation of interrogatory 5c, viewed standing alone and especially within the context of the surrounding questions. The interrogatories focus on Hercules' proffered reasons underlying its termination of plaintiff and individuals who were able to proffer those reasons.

In contrast, Hercules now seeks to offer the witnesses in question to testify about the quality (or lack thereof) of Finch's performance; it argues these witnesses did not know that Finch's performance was factored into the forced-ranking and termination decisions. Therefore, defendant argues, a listing of these witnesses was not required by plaintiff's interrogatories. Hercules [*24] has tendered a brief description of each of the witnesses in question. James J. Anthony served as Manager of Administration in the Audit Department and reported directly to plaintiff. He would be able to testify about the nature and quality of Finch's performance and present his view as to the functioning of the Audit Department. He was not, however, involved in the decision to terminate Finch.

Sue A. Murray was one of several "interim" managers who ran the Audit Department after Finch was terminated. At trial, she would testify that it was clear that her function in this capacity would be strictly on an interim basis, and that she was granted unencumbered access to the Audit Committee, a Committee of the Hercules Board of Directors. Hercules seeks to rebut plaintiff's assertion that Hercules engaged in "subterfuge" when terminating Finch and eliminating his position on an interim basis. *See* D.I. 204 at 30-31. Hercules would also elicit Murray's testimony regarding problems she encountered when running the Audit Department allegedly stemming from plaintiff's "poor management." D.I. 226 at 34.

Fred Buckner was Hercules' President and Chief Operating Officer during the years antedating [*25] the 1991 RIF. Buckner served as the leader of Hercules' President's Team and was also a member of the corporation's Executive Team. These two groups evaluated the performance of different departments within the corporation, D.I. 227, Exh. O at 57; they were also responsible for the MICP evaluation, *supra,* section 1, which has been ruled admissible only if there is bifurcation of liability and damages. Hercules also argues that plaintiff has listed as one of his trial exhibits a document authored by Buckner and that Buckner should be allowed to testify about the document.

William Godfrey worked with Finch from 1980-1987 as Manager of Computer Audits. Hercules states that Godfrey will attest to plaintiff's unique relationship with CFO Engebretsen and his family during that time frame. Godfrey will also testify about Finch's personal activities purportedly occurring during the work day,

Case 5:07-mc-00515-FB-PMA    Document 3-3    Filed 06/25/2007    Page 8 of 14

Page 7
1995 U.S. Dist. LEXIS 19805, *

including sleeping, church business, and reading the newspaper.

David Hollingsworth was Hercules' CEO prior to Gossage. Hercules does not currently plan to call this witness during its case in chief, but wishes to reserve its right to do so if necessary.

The current record shows that none of the [*26] above witnesses were positioned to know that Finch's performance played a role in the ultimate decision to terminate him. With one qualification, the Court will allow these witnesses to present their testimony, as outlined by Hercules, at the upcoming trial. If there is no bifurcation, Buckner will not be allowed to testify about the MICP evaluation or any other similar evidence which was not considered in the decision to terminate Finch.

Plaintiff objects to an additional trial witness identified by Hercules, Harry Gordon, who from the mid-1980s until July, 1991, was Hercules' Human Resources Director of Executive Resources. Plaintiff argues that Hercules affirmatively misled him during discovery as to the scope of this witness's knowledge of and involvement with Finch's termination. Hercules initially identified Gordon as an individual who participated in the development of standards or criteria for evaluating employees during or in preparation for its 1991 RIF. However, Hercules later narrowed its characterization of Gordon's expertise in this area by describing Gordon as one who attended a meeting at which the RIF policy was discussed, but who played no role in developing standards [*27] or criteria for evaluating employees.

In November, 1992, Finch also asked to discover any Hercules documents related to the "replacement potential of all corporate financial positions" and for "promotability lists" prepared by Human Resources. D.I. 232 at C40. Hercules responded that there were none available at that time. In May, 1995, Finch renewed this same request for documents. Hercules responded by asserting it had just discovered an old notebook of Gordon's in a desk containing notes of business meetings Gordon attended in 1988. Gordon's notes quote Engebretsen, who was Hercules' CFO and Finch's direct supervisor, as declaring the corporation as needing "an accounting guru" and "Need Chief Auditor - repl Finch." D.I. 210, Exh F. at 5. After contacting Gordon, who had retired in July 1991, further probing revealed a 1985 file memo documenting a conversation between Gordon and MacKenzie. MacKenzie is said to have commented that plaintiff was "insecure" and was an "8:00-4:45 carpooler." Id. at 3. Hercules forwarded these and other of Gordon's documents to plaintiff's counsel in June and July of this year. It now seeks to call Gordon as a witness to testify how plaintiff was [*28] not highly regarded by his superiors.

Plaintiff argues that he has been prejudiced in his ability to prepare adequately for Gordon's trial testimony and that Hercules should not be allowed to profit from its abuse of the discovery process. Plaintiff therefore seeks to exclude this witness from testifying at trial.

The exclusion of otherwise admissible testimony because of a party's failure to meet a timing requirement is a harsh measure to be avoided where possible. *Central Maine Power Co. v. Foster Wheeler Corp.*, 115 F.R.D. 295, 297 (D. Me. 1987). However, sometimes, such exclusion is necessary; fidelity to the constraints of Scheduling Orders and deadlines is critical to the Court's case management responsibilities. *Tomlin v. Holecek*, 158 F.R.D. 132, 135 (D. Minn. 1994) (citing *Jochims v. Isuzu Motors, Ltd.*, 144 F.R.D. 350, 356 (S.D. Iowa 1992)). Accordingly, the "flouting of discovery deadlines causes substantial harm to the judicial system." *Id.* As a sanction for failure to comply with a timing requirement set by the Scheduling Order in this case, the Court is authorized to exclude evidence proffered by the disobedient party. *United States v. 68.94 Acres of* [*29] *Land*, 918 F.2d 389, 396 (3d Cir. 1990). However, the Court also acknowledges that unreasonable adherence to such deadlines, without regard to whether a party was justified for its actions, runs counter to the dominant interest in the trial process, *i.e.*, ascertaining the truth. These competing considerations are properly resolved by the Court in exercising its discretion. *DeMarines v. KLM Royal Dutch Airlines*, 580 F.2d 1193, 1201 (3d Cir. 1978).

When considering whether to exclude testimony, courts generally look to the following: "the ability of the party to have discovered the witnesses earlier, validity of the excuse offered by the party, willfulness of the party's failure to comply with the court's order, the party's intent to mislead or confuse his adversary, and the importance of the excluded testimony." *Stewart v. Walbridge, Aldinger Co.*, 162 F.R.D. 29, 31 (D. Del. 1995) (citing *Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894, 904 (3d Cir. 1977), *overruled on other grounds*, *Goodman v. Lukens Steel*, 777 F.2d 113 (3d Cir. 1985), *aff'd*, 482 U.S. 656, 96 L. Ed. 2d 572, 107 S. Ct. 2617 (1987)). Based on these considerations, the court must [*30] weigh (1) the prejudice or surprise to the party against whom the excluded witnesses would have testified, (2) the party's ability to cure the prejudice, (3) the extent to which calling undisclosed witness would disrupt the trial process, and (4) bad faith or wilfulness in failing to comply with the court's order. *Meyers*, 559 F.2d at 904-05.

At this point, on the eve of trial, the Court is inclined to exclude this witness. Defendant has not offered any compelling justification for why the documents were not produced when first requested during discovery. Hercules enjoyed access to both the documents and was able to

reach Gordon for more information (even though he retired three years ago), and should have done as much as part of its duty to diligently produce evidence requested by its opponent. Plaintiff has been both surprised and prejudiced in not being able to depose this witness and prepare accordingly for trial. It would be unfair to plaintiff to have his case preparation impacted and disrupted at this late date. Additionally, there is no evidence that MacKenzie relied on any of this evidence when force-ranking or terminating Finch. On balance, consideration of the above [*31] factors weigh in favor of excluding this witness from trial.

**B. Defendant's Motion in Limine**

**1. Evidence of Hercules Financial Earnings After the 1991 RIF**

Hercules seeks to preclude at trial evidence of the earnings and financial status of both the corporation and several of its top executives. Plaintiff argues that Hercules has placed its financial condition at issue when its CEO Gossage declared the purpose of the 1991 RIF was to cut indirect costs and put the company back on the path towards being "lean." Plaintiff's Answer Brief, D.I. 228 at 27. Plaintiff also "vigorously disputes Hercules' justification for the RIF" and "believes the RIF, as applied to him, was totally pretextual . . . ." *Id.* at 27. Specifically, Finch argues that there are substantial reasons to dispute whether Hercules' fiscal health was in serious jeopardy and whether Hercules' proffered economic justification for the RIF is worthy of credence.

Hercules argues that this evidence is not probative of whether the corporation discriminated against plaintiff based on his age. Rather, it asserts, evidence of Hercules' financial wealth would serve to prejudice the jury against defendant and [*32] its senior officers by portraying them as "avaricious fat cats who can afford to pay a sizable judgment." D.I. 209 at 2. The Court agrees. First, plaintiff seeks to introduce evidence of Hercules' earnings and argue that the RIF was not economically justified. According to plaintiff, Hercules' annual net earnings/losses were as follows: 1989, the corporation lost $ 81 million; in 1990, following a RIF, it enjoyed a net income of $ 96 million; in 1991, it similarly gained $ 95 million. In addition, plaintiff seeks to introduce the salaries and bonuses of both Hollingsworth and Gossage, Hercules's two most recent Chief Executive Officers. Their salaries ranged from the high six to low seven figures; plaintiff seeks to draw the inference that because Hercules was willing and able to afford such high-priced talent, it must not have been in such economic dire straits as to justify the 1991 RIF.

These figures would seem staggering to those uninformed about the operation of a large, Fortune 500 corporation such as defendant's. Were plaintiff allowed to introduce such evidence, defendant would no doubt find itself required to define in great detail the meaning of these numbers and how they [*33] compare with other similarly situated businesses and top executives. Hercules would also likely seek to illustrate the economic projections and reasoning behind the multiple RIF's and whether, in hindsight, the prospective RIF planning correlated to the eventual financial results. In addition, the corporation would explain whether other forces impacted these financial statistics, such as availability and cost of raw materials, market demand, and the economic climate both national and international.

Corporations implementing a RIF generally have an explicit plan to reduce expenses by eliminating jobs. *Hardin v. Hussmann Corp.*, 45 F.3d 262, 264 (8th Cir. 1995). Such corporations usually provide decisionmakers with objective criteria by which to decide which jobs to eliminate. *Id.* At trial, plaintiff will have every opportunity to explore Hercules' stated reasons and criteria for terminating him pursuant to the RIF. However, the Court finds there is no requirement for a corporation to be in financial distress before embarking on such a RIF. *Id; Bashara v. Black Hills Corp.*, 26 F.3d 820, 824-25 (8th Cir. 1994). Therefore, the Court is not inclined to allow a mini-trial on [*34] the issue of whether Hercules' RIP was an exercise in sound business judgment. The presentation of Hercules' financial history in the years after the 1991 RIP would consume much trial time and serve only to distract attention from the pivotal issue in this case: whether Hercules discriminated against Finch based on his age when it terminated him. Accordingly, the Court holds that the prejudice to defendant resulting from admission of evidence of earnings of Hercules and its senior executives after the would substantially outweigh any probative value this evidence would have.

**2. Statements by CEO Gossage**

Plaintiff proposes to introduce before the jury the following: (1) a newspaper article appearing in the Wilmington *News Journal* containing comments attributed to CEO Gossage; (2) an article published on February 1, 1991 in *Horizons,* an internal Hercules publication; (3) remarks by Gossage to a Hercules executive named William Hosker in January, 1992; (4) remarks allegedly made by Gossage to another Hercules executive named Doyle Miller, and subsequently repeated by Miller to Hosker.

**a. The *News Journal* Article and the *Horizons* Article**

Plaintiff seeks [*35] to admit a Wilmington *News Journal* article entitled, "Hercules will cut 450 jobs," which quotes Gossage as saying, "The young people in

the company want us to bring Hercules back to where it ought to be again. . . . Older people will see friends impacted and will feel bad about it. But we'll get this behind us." D.I. 119 at A539. In his deposition, Gossage testified that if not a direct quote, the article was a "similar quote" to something he said and at least captured the spirit of what he said. D.I. 121 at B71. The article was published on January 9, 1991, right as final approval was given for the RIF to get underway. D.I. 229 at B65, 68.

Subsequently, *Horizons*, Hercules' internal corporate newsletter, published an article styled in a question and answer format, entitled "Gossage answers employees' questions." In the article, Gossage was asked to amplify his statement published in *The News Journal*, and was quoted as saying:

> What I said was that younger employees want to know when the company will get up and turn itself around, and I acknowledged that to those with long service to the company, it was painful to watch what was going on. I'd say it again.

D.I. [*36] 121 at B288. Gossage allegedly made these remarks during a presentation at the Hercules Men's Club.

Hercules argues that Gossage's comments should not be admitted at trial for several reasons. First, it contends they are irrelevant and characterizes them as merely "observations about the reaction of Hercules' employees to the voluntary phase of the RIF, and generalities about evolutionary changes in expectations about the permanency of employment in the corporate world." D.I. 209 at 10. Second, it characterizes Gossage's remarks as "stray remarks" that are not indicative of age bias. Under the so-called "stray remark" doctrine, such remarks "made by non-decisionmakers or by decisiomakers unrelated to the decisionmaking process are rarely given great weight" and are not direct evidence of discrimination. *Armbruster v. Unisys Corp.*, 32 F.3d 768, 779 (3d Cir. 1994) (citing *Ezold v. Wolf, Block, Schorr and Solis-Cohen*, 983 F.2d 509, 545 (3d Cir. 1992), *cert. denied*, 510 U.S. 826, 126 L. Ed. 2d 56, 114 S. Ct. 88 (1993)). Hercules maintains that Gossage had "very little to do with the 1991 RIF." D.I. 209 at 14.

The Court disagrees with both of Hercules' assertions. Fed. R. Evid. 401 defines [*37] relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The rule, therefore, sets a low threshold for relevancy, *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 783 (3d Cir. 1994), *cert. denied*, 131 L. Ed. 2d 134, 115 S. Ct. 1253 (1995); evidence is irrelevant "only when it has no tendency to prove [a consequential] fact," *Spain v. Gallegos*, 26 F.3d 439, 452 (3d Cir. 1994) (citing *Blancha v. Raymark Indus.*, 972 F.2d 507, 514 (3d Cir. 1992)).

Gossage's statements in *The News Journal* and in the *Horizons* newsletter easily satisfy this lenient relevancy standard. In this disparate treatment case, plaintiff seeks to prove a discriminatory motive on the part of Hercules; he may meet his burden either by presenting direct or indirect evidence of unlawful age discrimination. *Healy v. New York Life Ins. Co.*, 860 F.2d 1209, 1214 (3d Cir. 1988), *cert. denied*, 490 U.S. 1098, 104 L. Ed. 2d 1004, 109 S. Ct. 2449 (1989). As to Hercules' second contention, the Court finds that Gossage, as the corporation's CEO and leader, was [*38] well positioned to set the tone for the 1991 RIF. His highly public statement explaining the RIF to *The News Journal* demonstrates Gossage's intent to exhibit strong leadership at the corporate helm. Consequently, "because discriminatory comments by an executive connected with the decisionmaking process will often be plaintiff's strongest circumstantial evidence of discrimination, they are highly relevant." *Abrams v. Lightolier, Inc.*, 50 F.3d 1204, (3d Cir. 1995). Here, Gossage explicitly distinguished between older and younger employees and how he perceived the younger employees, as opposed to the older ones, as those who wanted to bring the corporation back to a better condition; it is for the jury to weigh the competing inferences generated by these remarks. *See Siegel v. Alpha Wire Corp.*, 894 F.2d 50, 54-55 (3d Cir.), *cert. denied*, 496 U.S. 906, 110 L. Ed. 2d 269, 110 S. Ct. 2588 (1990) (reversing district court for holding that the defendant's use of the phrase "old dogs won't hunt" was not sufficiently probative to be admissible). As the Third Circuit Court of Appeals has observed:

> when a major company executive speaks, "everybody listens" in the corporate [*39] hierarchy, and when an executive's comments prove to be disadvantageous to a company's subsequent litigation posture, it cannot compartmentalize this executive as if he had nothing more to do with company policy than the janitor or watchman.

*Lockhart v. Westinghouse Credit Corp.*, 879 F.2d 43, 54 (3d Cir. 1989). Thus, it is possible that MacKenzie and other Hercules personnel were influenced by Gossage's characterizations of older versus younger employees; drawing or not drawing this inference will also be within the province of the fact-finder at trial. The Court holds

this evidence to be relevant to plaintiff's proof of the corporation's anti-age animus.

Hercules adds that even if the remarks are relevant, plaintiff attempts to exploit them "out of context and without any basis in fact." D.I. 209 at 11. Thus, defendant argues, these comments, are misleading and inflammatory, and, if admitted, would be more prejudicial than probative. The Federal Rules of Evidence set forth the standard for this discretionary balancing: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, conclusion of the issues, [*40] or misleading the jury . . . ." Fed. R. Evid. 403. Thus, to exclude Gossage's remarks under Rule 403, their probative value must be "substantially" outweighed by their potential for prejudice. The Court finds such prejudice lacking here. It is axiomatic that all evidence adverse to a party is prejudicial; under the rule, the prejudice should rise to a level tantamount to being unfair. *Dollar v. Long Mfg., N.C. Inc.*, 561 F.2d 613, 618 (5th Cir. 1977), *cert. denied*, 435 U.S. 996, 56 L. Ed. 2d 85, 98 S. Ct. 1648 (1978). At trial, Hercules will be afforded ample opportunity to provide context and explanation for Gossage's remarks. Accordingly, the Court does not find Rule 403 to be a basis for excluding this evidence.

In its Reply Brief, D.I. 233, Hercules does make a final persuasive argument for exclusion of the *Horizons* article: it correctly identifies the article as hearsay under Fed. R. Evid. 802. Hercules argues that if the basis of the article was Gossage's Men's Club speech, then plaintiff must introduce admissible evidence of the speech, and not a hearsay article about the speech published later. The Court agrees that the Horizons article, even though arguably relevant, [*41] must be excluded as inadmissible hearsay.

Finally, Hercules argues that *The News Journal* article should be excluded because to do otherwise would have a chilling effect on free decisionmaking and encroach on an executive's right to speak about Hercules' future. As legal theory for this argument, Hercules relies on the First Amendment to the United States Constitution. The Court finds that this assertion emotes more heat than light, as there is no state actor involved in this case against whom the First Amendment could be invoked. Consequently, the Court finds this argument wholly without merit, warranting no further analysis.

### b. Remarks Attributed to Gossage by Hosker

Plaintiff also seeks to call William E. Hosker, who is the retired head of Hercules' Resins Group. In 1992, approximately one year after Finch's termination, Gossage led a reorganization of the corporation. In the reorganization, Hercules established three new groups: Chemical Specialties, Food and Functional Products, and the Hercules Materials Company. D.I. 229 at B43. According to Hosker, Gossage expressed his intent to have in place at the head of each group, positioned immediately below him in the corporate [*42] hierarchy, individuals who would be part of a cadre of qualified CEO candidates who would be in their early 50s by the time Gossage retired. Hosker claims Gossage made it clear that Hosker would be passed over because Hosker was already 54 years old. D.I. 58 at 20-21. According to Hosker, Gossage explained that "someone in their late 50s typically looks, expends their energies in preparing their retirement . . . . [while] younger people have perhaps more energy and a longer period of time in which they can perform their duties." *Id.* at 27.

In its opinion on Hercules' summary judgment motion, the Court refused to consider this evidence. *See Finch v. Hercules*, 865 F. Supp. at 1125. For purposes of admissibility at trial, the Court reaches a similar result. While this statement on its face may raise an inference of age discrimination, the issue Gossage's statement was addressing, CEO succession planning, is a far cry from the issue in the instant case. The hiring and promotion of individuals to the position of Chief Executive Officer is treated differently under the ADEA. Under the statute's executive and policy making exception, 29 U.S.C. § 6631(c)(1), a company has a right [*43] to require its CEO to retire at age 65. [7] At summary judgment, the Court held that "age bias in [such] promotion decisions simply does not make age bias in termination decisions more likely. Further, to the extent this portion of Hosker's testimony is minimally relevant, . . . its probative value is substantially outweighed by the danger of unfair prejudice." *Finch v. Hercules*, 865 F. Supp. at 1125. These same considerations apply with full force at this stage of the litigation.

---

[7] At the pretrial conference in this matter, counsel for Hercules for the first time verified that the company does in fact have such a retirement policy for its CEO. However, this evidence was not known nor necessary to the Court's decision at summary judgment; the Court likewise need not consider it here.

---

Hosker would also testify about a June 1992 meeting conducted by C. Doyle Miller, Hosker's direct superior. At that meeting, Miller discussed the results of the Management and Organization Review for Hosker's Chemical Specialties [*44] Group. While doing so, Miller relayed certain comments that Gossage had allegedly made to him; Hosker dictated a memo to his file that referenced these remarks. Hosker's memo states *inter alia,* that:

The only negative criticism received by Miller was Gossage's statement that the Chemical Company had not aggressively or creatively addressed "tired warriors," who, though contributing to the corporation, were blocking the movement of young, aggressive people, upon whom the future of the company had to be built.

D.I. 229 at B12. As a backdrop to this statement, plaintiff explains that "Gossage planned to get younger employees into the pipeline so that they could rise through developmental positions into the more senior positions and provide the Board with a choice of candidates to replace him when he retired." D.I. 228 at 13. Plaintiff quotes Gossage as testifying that "there has been, since I took over the [CEO] position, an ongoing effort between the Board and myself on a regular basis to talk about my eventual retirement and the candidates who might replace me and what development plans are in place to prepare them for that eventuality." D.I. 229 at B34.

Hercules [*45] correctly notes that this testimony was before the Court at summary judgment as well, and the Court declined to make a definitive ruling pending further illumination of this testimony. In its opinion, the Court requested clarification (1) as to the timing of these statements relative to Finch's termination, (2) whether Gossage actually used the words "tired warriors," (3) if he did use the term, what meaning did he ascribe to the phrase, and (4) whether this remark was targeted specifically to the Chemical Specialties Group. *Finch v. Hercules*, 865 F. Supp. at 1125. The record shows that this remark allegedly occurred approximately 16 months following the 1991 RIF and Finch's termination. Miller denies ever using the phrase in any meetings he conducted or hearing Gossage use the phrase. D.I. 210 at Exh. G. The record is silent as to whether Gossage himself admits or denies making this statement and what it meant. Miller's memo defines the remark as directed specifically at his Chemical Specialties Group. D.I. 229 at B12. As such, Hercules argues that it is unrelated to the termination of Finch.

The Court finds the issue of admissibility of this evidence a closer question. Standing [*46] alone, the temporal remoteness of the statement is not troubling; it could very well indicate an ongoing corporate anti-age bias. Courts have found on numerous occasions remote statements admissible as circumstantial evidence of age discrimination. *Abrams*, 50 F.3d at 1214 (citing *Lockhart*, 879 F.2d at 54; *Roebuck v. Drexel Univ.*, 852 F.2d 715, 733 (3d Cir. 1988)). However, the hearsay nature of Hosker's memo and the circumstances surrounding the document's generation call into question the document's reliability. At summary judgment, the Court voiced concern about the stratified nature of the statements at issue here: Gossage to Miller to Hosker to Hosker's memo to file. The Court is willing to assume *arguendo* that Gossage and Miller both made this alleged remark in their capacities as corporate agents acting within the scope of their agency or employment. *Finch v. Hercules*, 865 F. Supp. at 1126 and n.21. It is at the next level of hearsay, *i.e.*, Hosker's hearing the remark and reducing to writing that is troubling.

Plaintiff has argued that it can show that Hosker's memorandum would satisfy the requirements for the business records exception to the hearsay [*47] rule, Fed. R. Evid. 803(6). However, even if this document could be admitted under this rule, the inquiry into the admissibility of this evidence does not end here. Hosker may have been motivated to make this record for considerations other than the ordinary course of business. Just a few months earlier, in January 1992, Hosker was passed over for promotion and has testified that he is of the opinion he was discriminated on the basis of his age. D.I. 158, Exh. 1 at 31, 34. He candidly expressed that as result, he felt disadvantaged, and retained an attorney to look into the matter *Id* at 31. In June, 1992, when Hosker recorded his impression of the meeting conducted by Miller, he wrote

> Upon questioning Doyle as to the definition of "tired, old warriors," I used the phrase "white, old males," and was admonished that while perhaps that was an equivalent connotation, we must refrain from language that speaks to age discrimination. My point was that, in fact, Tom Gossage and Doyle Miller are urging management to find a mechanism to move old people out of key jobs to make way for younger personnel. To further clarify, I asked Doyle for a profile of a typical "tired, old warrior." [*48] His words were, "Someone who may be 54 years old, contributing to the corporation and planning to work until age 65. These types of individuals are blocking the ability to move people through."

D.I. 229 at B12. Hosker's memo clearly records Hosker's sentiments as to the meaning of the phrase "tired warriors." Hosker unabashedly interjected the word "old" into the phrase and recorded his own interpretation of the remark, an interpretation consistent with his previous impression that Gossage was discriminating against older managers such as himself. As someone who had already felt wronged by Gossage's conduct, Hosker seized the

opportunity to memorialize in writing his subjective impression of what he considered further evidence of age discrimination by his employer. The memo does not set forth an objective explanation of what meaning Gossage attributed to the remark; "tired warriors," standing alone, may or may not implicate considerations of age. *See EEOC v. Clay Indus.*, 955 F.2d 936, 942 (4th Cir. 1992) (analogous phrase, "dead wood" referred to employee evaluations regardless of age). Considering Hosker's jaundiced eye towards Gossage, the Court views this memo as reflective [*49] of Hosker's subjective opinion regarding Gossage's alleged remark. As such, the memo's potential for prejudice in misleading and confusing the jury substantially outweighs it probative value.

Although Hosker's memo will not be admissible at trial, the Court will allow Hosker to testify that he heard Miller relay Gossage's alleged "tired warriors" comment at the May 29, 1992 presentation. Plaintiff will still be afforded opportunity to expose this remark to the jury, and defendant may vigorously cross-examine and present its opposing evidence regarding the nature or even the existence of this remark. In so doing, however, the potential prejudice to Hercules by the extra layer of hearsay, Hosker's memo, will be eliminated.

### 3. Exclusion of Plaintiff's Witnesses

In the Pretrial Stipulation, plaintiff lists five witnesses whom he has never before identified as having information about the subject matter of this case. These witnesses are Maynard Turk, Alexander Sean, James Hunter, Chris Witham, and Gary Dunn. Similar to plaintiff's motion in limine to exclude witnesses, defendant seeks a ruling that these witnesses not be allowed to testify because they should have been, but were [*50] not, disclosed during discovery.

In its First Set of Interrogatories, Hercules asked plaintiff to "identify all persons that you know or believe have information regarding the subject matter of this action, and describe the information." D.I. 210, Exh. K. Plaintiff did not include any of these witnesses in his answer. Under Fed. R. Civ. P. 37(c)(1), the Court may permit witnesses not disclosed during discovery if the failure to disclose the identities was harmless, or if there was "substantial justification" for the non-disclosure.

Plaintiff claims that its failure to disclose these witnesses' identity was substantially justified because he had no idea, until summary judgment, that Hercules intended to proffer evidence on why it terminated Finch, *i.e.*, justification based on plaintiff's record of performance. D.I. 228 at 32-33. The Court does not find this argument at all convincing. At deposition, MacKenzie explicitly testified that he based his forced ranking of Finch on Finch's performance. D.I. 121 at B-106. Hercules claims that its subsequent termination of Finch was influenced at least in part by the results of the forced-ranking; it could not have been clearer that plaintiff's [*51] performance would be at issue. The Court finds that plaintiff should have disclosed the names of these witnesses in response to the above interrogatory and that plaintiff's purported reasons for his nondisclosure do not rise to a level of being substantially justified.

Similarly, the Court does not find the nondisclosure to be harmless; the *Meyers v. Pennypack* considerations outlined above in section 4b, *supra,* with respect to plaintiff's motion to exclude defendant's witnesses now apply in this converse situation. Defendant has been surprised and prejudiced in not being able to depose these witnesses and prepare accordingly for trial. Because it is the eve of trial, with two closely intervening holidays, the Court is unwilling to disrupt defendant's trial preparation with having to notice five deponents and coordinate schedules. It would be unfair to penalize defendant and in effect reward plaintiff's noncompliance. Consequently, these witnesses will not be allowed to testify at trial.

### 4. Plaintiff's Rebuttal Evidence Regarding his Bonus and Plaintiff's Trial Exhibits

Additionally, plaintiff listed in the Pretrial Stipulation evidence that Hercules asserts as involving [*52] the calculation of Finch's bonus; plaintiff argues that this evidence is relevant to his rebuttal case. Because this is rebuttal evidence, plaintiff does not wish to reveal his reasons for offering these documents for fear of exposing his trial strategy. The Court will defer ruling on this evidence until trial because the current record is not fully developed sufficiently to warrant a considered decision.

Similarly, defendant has delineated a laundry list of exhibits it seeks to exclude from trial. In his answering brief, plaintiff has provided brief descriptions of the exhibits and his arguments as to why they should be admissible. The Court has not actually viewed the exhibits nor had the benefit of oral explanation or argument on these exhibits. Out of fairness to both parties and a desire to fully appreciate this evidence, the Court will defer its ruling until such time, either at or before trial, that the parties may be heard more completely on these issues.

### 5. Defendant's Additional Motion in Limine

On November 29, 1995, defendant filed an additional motion in limine, D.I. 243, seeking a substantive ruling on the issue of the relevant time frame for calculation of plaintiff's [*53] damages. Defendant's Reply Brief was filed on December 20, 1995. A review of the briefs makes clear the relief defendant seeks is merits relief masquerading as a motion in limine. The proffered record is not appropriate for consideration of merits re-

lief. Because trial will commence on January 8, 1996, and there is inadequate time to both put this matter in the correct procedural posture, and determine the same, the Court is not inclined to consider any application for merits relief. If it should become necessary, since the matter goes to the appropriate amount of damages, it can be treated by post-trial motion.

## IV. CONCLUSION

For the above discussed reasons, the Court will grant in part and deny in part Plaintiff's Motion in Limine, D.I. 211, and do the same as to Defendant's Motion in Limine, D.I. 209. Defendant's Motion in Limine, D.I. 243, is denied. An appropriate order will issue.